HENRY W. DOREMUS et al.

*v.*

THE CITY OF PATERSON.

[Decided January 4th, 1913.]

1. An award fixing the damages to a landowner during a stated time from pollution of a stream by a city is not an adjudication of the amount of damages suffered subsequently.

2. In an action for damages to suburban real property caused by the pollution of a stream, the damages must be assessed on the value of farming property, even though complainants' experts testified as to its problematic value for city purposes.

3. In a suit for damages to real property caused by the pollution of a stream, where a depreciation of $800 in the sale price was admitted, but the defendant undertook that at the end of five years such pollution would be removed, the measure of damages for that depreciation is not the interest on the difference in price calculated on the assumption that the city's undertaking was improbable, but the interest on the difference between the present price calculated as if the pollution would be removed at the end of several years, and the price as if there were none.

4. In a suit for damages to real property caused by the pollution of a stream through the introduction of sewage, the owners are entitled to adequate compensation. and so, where the bed and banks of the stream have been permanently polluted, they are entitled to damages therefor, even though the emptying of the sewage has been stopped.

5. Where a right depends upon the happening in future of some contingent event, the court will not pass upon it until the contingency occurs; hence the amount of damages to which landowners may be entitled for the pollution of a stream at the end of a given period will not be computed, where defendant claims that after that time it will no longer pollute the stream, and it does not appear in what condition the stream will be left.

*Mr. J. Edward Ashmead* and *Mr. Chauncey G. Parker,* for the complainants.

*Mr. Edward F. Merrey,* for the defendant.

STEVENS, V. C.

This case has been before me on several previous occasions. *63 N. J. Eq. (18 Dick.) 606; 65 N. J. Eq. (20 Dick.) 711;*

69 N. J. Eq. (3 Robb.) 176; 70 N. J. Eq. (4 Robb.) 296; 73 N. J. Eq. (3 Buch.) 476. I shall not repeat what has been said, nor shall I attempt any further discussion of the merits than is necessitated by the new evidence. The question is, What award shall be made to the complainants for the injury done and to be done to their respective properties because of the continuance, for four years, of the pollution of the Passaic river by the defendant's sewage?

The prayer of the bill was, originally, for an injunction only, but, in accordance with the decision of the court of errors and appeals (60 N. J. Eq. (15 Dick.) 385), it was so modified that it prayed for an injunction unless and until the defendant made such compensation to complainants respectively, for the diminution in value of their said lands and property rights, as should be ascertained to be just. The city elected to make compensation and an award was made accordingly. The final decree, made June 26th, 1908, awarded compensation on the basis of a continuance of the nuisance until March 26th, 1911, and then provided that an injunction should issue on that date with, however, the following proviso:

"If notwithstanding the exercise of due diligence, the mayor and aldermen of the city of Paterson is unable to cease polluting the river by the time aforesaid, leave is reserved to apply to this court, upon such terms as this court may deem equitable, to postpone the time of issuing said injunction to a day to be fixed by this court."

The city at first applied for a further term of *five* years, but subsequently changed it to *four*.

On the former hearing, as a convenient means of reaching a definite result, I prepared a table of the annual or rental values of the various properties. It will be found in 73 N. J. Eq. (3 Buch.) on page 506. I then, arbitrarily, for reasons there explained, estimated the diminution in annual value caused by the pollution of the river, attributable to Paterson alone (for I found pollution from other sources), as follows: For the year 1892, five per cent. of the sums named in the table, and for each succeeding year, one per cent. in addition. The amounts computed on this basis were promptly paid. The gradually increas-

ing percentage was given because of the admitted fact that as the city increased in population and built new sewers, the pollution also increased.

From this table it would have been possible to have computed the probable injury for the four years' period now under consideration, but the complainants, with a view of showing that the compensation thus ascertained would be inadequate, introduced new evidence.

At the former hearing, although the complainants put in a great deal of evidence on other points, they did not introduce testimony as to annual or rental values. I, necessarily, took as my guide on that subject, evidence of the defendant's experts. On this hearing, the complainants have, themselves, called experts, and as their testimony differs widely from that of the city's, I am obliged to subject the above mentioned table to revision.

Counsel for defendant argues that the matter is *res judicata*, but it is evident that it is not. The injury to be inflicted on the complainants by the wrongful acts of the defendant for the four years beginning March 26th, 1911, will be, no doubt on the whole, greater year by year than that inflicted upon them in the five years immediately preceding that date. The adoption of an arbitrary standard for the ascertainment of the probable amount of injury that would be suffered in the earlier period, could not operate to prevent the court from making a new finding as to the later period, if the evidence justified it—the injuries both in point of time and of quantity being distinct.

On the former hearing, I gave compensation only for loss in annual values. It is now very earnestly argued that the evidence demands an additional award that will compensate the complainants for the injury to be suffered in not being able to sell their respective properties except at greatly depreciated prices.

Mr. Harrison Van Duyne, and the other experts called by complainants, thus estimate this loss. They say (taking the property of Mr. Cadmus, on the Bergen county side of the river, as an illustration) that thirty acres of his land, excluding the frontage, which they estimate on a different basis,

"is materially damaged in its selling value by the present condition of the river. If the river was clean it would be worth $800 per acre, or $24,000; under present conditions it would not sell for over four hundred dollars per acre, or $12,000, making a loss of $12,000 in value." ·

They then calculate interest on $12,000 at six per cent., or $720 per year. This, multiplied by four, amounts to $2,880, and is, they say, the compensation Mr. Cadmus should receive for the four-year. period. They make a similar estimate in the case of other complainants.

The defendant's estimate is altogether different. Mr. Lee, and other witnesses for the city, say that the Cadmus property is nothing but a "farming proposition," worth $200 per acre, and that it has, at present, little, if any, speculative value.

Two of the complainants' five witnesses on this point, Mr. Mercer and Mr. Coe, come from Bergen county. Mr. Allen comes from Passaic, Mr. Van Duyne from Newark, and Mr. Karl from Garfield. Newark is growing more rapidly than Paterson, and the increase in population in Garfield, Passaic and Bergen county is phenomenal. Mr. Coe testifies that there are very few farms left in Bergen county except along the Passaic; that "they are most all cut up," and either developed or awaiting development, except in the northern part, which is · rocky and mountainous. The optimistic testimony given by these witnesses is very naturally ascribable to the rapid rise in values in the localities with which they are most familiar. On the other hand, the witnesses for the city come either from Paterson itself, where it would seem rents are very low, or from the farming districts of Passaic county, west of ·Paterson, where good farm lands may still be had for $100 per acre. It is not unlikely that the judgment of the various witnesses on both sides has been colored by the development, or lack of development, of the districts from which they come. Now, such of the complainants' lands as lie in Bergen county, east of the Passaic river, and which, with the exception of the Gelderman property, are still farmed, and, apparently, with success, seem from their situation at its western extremity to be quite as much affected by conditions in Paterson, which they immediately adjoin, as by those resulting from the New York overflow. It would, how-

ever, seem that even these lands are not altogether exempt from the immense rise in values which are taking place in that county. It would seem, too, as I have pointed out in my former opinion, that at no very distant day they, or a considerable part of them, are destined to be used for factory purposes. There is a steady advance of this character up the river from Passaic, and perhaps not so marked an advance down the river from Paterson. This might, in the estimation of buyers, give them some added value, although the witnesses for the city will hardly admit it.

In view of the conflicting evidence, it is hard enough to assign a value to the lands, even under present conditions. It is harder to say what they would be worth if conditions were such as prevailed thirty years ago, and still harder to guess their additional value (over present values) if the factory pollution, for which Paterson is not responsible, and which I have heretofore found to amount to from one-quarter to one-third of the total pollution, should be admitted as a factor in making an estimate—that is, an estimate based upon the assumption that the river would be free from the Paterson pollution but fouled by the factory pollution.

The properties which lie on the east bank of the Passaic have been for two hundred years or more utilized as farms; they were so utilized thirty years ago when conditions were perfect, and they are now so utilized. The witnesses for complainants, notwithstanding, divide each tract into two separate parts. They convert the front parts, which include the farm houses and six or seven acres adjoining the river, into suburban residences assigning a rental value to them as such, and they give to the rear parts, embracing much the larger acreage, a price such as it would have if ready for speculative development.

Basing their valuations, as they do, upon assumptions which are so problematical and incapable of verification, I do not feel justified in making them the basis of an assessment. The principle of *Hatfield* v. *Central Railroad Co., 33 N. J. Law (4 Vr.) 252*, referred to in my former opinion, would seem to apply.

There is another fallacy (at least from a legal standpoint) in complainants' estimates. They are all, evidently, based upon

the assumption that the injury will continue *after* the lapse of
four years. Defendant, in its amended answer, says:

"2. That defendant has not taken the respective lands and property
rights of the complainant except so far as the injury to them, if any such
injury there may be through or by means of its sewerage system in the
complainants' bill mentioned, may be considered as such taking, and that
such injury or taking is to be temporary and is to continue no longer than
five [now four] years from the date of the filing hereof," &c.

It is apparent that the assumptions made by the witnesses
and those which must be made by the court are different. If I
am to assume that the pollution is to cease on March 26th, 1915,
as the answer says it will, an estimate that the property will be
worth in the market at any time prior to that date $400 per acre,
and thereafter $800 is altogether unreasonable. I shall revert to
this subject hereafter in another connection.

My conclusion as to these farm properties is that they must
be dealt with as such. They are farm properties now and they
are likely to remain so for an indeterminate time longer.

Notwithstanding all this, I would not be justified in disre-
garding the testimony of complainants' witnesses altogether. It
is given by gentlemen of intelligence and large experience. At
the former hearing, I had only the defendant's witnesses to guide
me; now I have experts on both sides. It is, unquestionable,
that the value of a property is one of the factors which goes to
fix the amount of rent to be asked, and it is, on the other hand,
equally unquestionable that a farmer cannot afford to pay a rent
that will prevent him from making a profit. In view of all the
facts and of those considerations which will be found in my
former opinion, I have come to the conclusion that the rental
values in the table should be somewhat increased for the purpose
of estimating the injury, and that the sliding percentage hereto-
fore adopted should be applied to these values thus corrected.

There are some exceptional cases—

*First.* The Gelderman property. This is the only suburban
residence property on the east side of the river. It has been con-
siderably improved since the last hearing and its rental value
has been increased. Mr. Lee, testifying for the city, says that
it is now $500, and with the river free from pollution, not more

than $600. Mr. Van Duyne, and some of the other witnesses for complainants, say that on an eight per .cent. basis, the rent should be, if the river were pure, $1,080. Considering the value they place upon the building this would seem high. For the purposes of estimating the injury, I will assign to it and to the land appurtenant to it a rental value of $650—more than double my former estimate.

*Second.* The Nash property. This is on the west side of the river. My previous estimate of its annual or rental value was $850. In view of the new evidence, this is manifestly too low. One thousand two hundred dollars for the three houses is not, I think, excessive. In addition to the three houses, Mr. Nash has a separate tract of twelve acres, fronting on the lake and unimproved. Since the last hearing, and in consequence of the rapid growth of the city of Passaic northward, it would seem that this lot has become ripe for development. Its advantageous disposition is unquestionably affected by the pollution. Mr. Lee, a witness for Paterson, and Mr. Van Duyne, a witness for the complainants, agree that, with the pollution, it is worth $1,200 per acre; without, $2,000. But $1,200 represents the value, not on the basis of a pollution to cease on March 26th, 1915, but on an indefinite continuance of it. This is what Mr. Van Duyne says:

"*Q.* Suppose that assurances were given that within three years that nuisance would be removed, what effect would that have on the purchaser?

"*A.* It would depend somewhat upon how the purchaser looked at that matter. My own judgment is against all possibility of removing the nuisance in three years, even if the sewage is taken out.

"*Q.* Answer the question as it is put now. I am asking you how, if there was assurance given that the nuisance would be removed in three years, what effect would that have upon a possible purchaser? Would he give more with that assurance than he would under the theory on which you testify?

"*A.* If he had positive assurance that within three years the river would be clean—why I think that the difference then would not be one-half, the way we have concluded that it would be in a number of these cases.

   \*     \*     \*     \*     \*     \*     \*     \*

"*Q.* With the effects removed now, a person knowing it would be done within a certain time, he would give a great deal more than the one-half you mention?

"*A.* Then I think he would give more.

"*Q.* A great deal more, too?

"*A.* Well, considerably more."

Mr. Lee, giving evidence from the city's standpoint, after saying that $1,200 would represent the value, in the polluted condition of the river, and $2,000 in the unpolluted, says:

"*Q.* Suppose assurance were given to you that within three years the sewage would cease to flow into the river, what would you consider the present value per acre?

"*A.* Well, then I would get down to figures. I would try to establish what it was going to cost me to hold that property for three years. I would take into consideration the interest and the taxes. I would arrive at it in that way, I think."

Mr. Van Duyne's way of arriving at the amount of injury, on the basis of pollution to continue indefinitely, I state in his own words:

"In my judgment if the river were clear it [12 acres] would be worth $2,000 per acre or $24,000. With the present condition of the river I don't think it is worth over $1,200 per acre or $14,400. Loss in value $9,600, interest on same at six per cent. $576.00."

Multiplying $576 by four, we have $2,304, as Mr. Van Duyne's estimate of Mr. Nash's injury during the four-year period. But it is perfectly apparent that if the nuisance were to cease at the end of the period, the loss would be less. A purchaser who pays $1,200 for what in four years he will be able to sell for $2,000, not only gets back his interest which, at six per cent., would amount to $288, but gains, in addition, over $500. From this, however, should be deducted taxes, which would amount, perhaps, to from $50 to $75. A purchaser paying $1,550 for the property at the beginning of the four-year period would be fully reimbursed for his outlay at the end of it, if he could realize $2,000. Taking $1,550 and applying Van Duyne's method of computing the injury, we would have the following: Subtract $18,600 (*i. e.*, 1550 x 12) from $24,000 and there is left $5,400, which multiplied by six gives $324 as the annual loss. This multiplied by four ($1,296) would represent Mr. Nash's compensation for his injury thus estimated. If we take into account the fact that he not only loses interest on his investment, but also pays taxes, that sum would not appear to be excessive. I doubt whether the factory pollution alone would

materially affect values at this point. Mr. Van Duyne very properly estimates the loss of annual interest, not on $2,000, but on that sum diminished by what he regards as the present selling price.

*Third.* The Mercelis property. This property is on the west bank of the Passaic not far from the Nash property. It is a single tract extending from the river to Lake View avenue. For the rental value of the house and land, about twenty-six acres, I gave at the former hearing, $350. I am inclined to think that this is a fair rental for the house, considering its character, and for the ground immediately adjoining it. It fails, as the evidence now stands, to represent the injury to the remaining property, which is, according to the testimony, ripe for development. The tract is somewhat injured by the nuisance, though not to the same extent as the Nash property just considered, for it is back from the river. The sum to be given for the injury is necessarily an arbitrary one. One hundred and fifty dollars per annum on this account would not, I think, be too much.

*Fourth.* The Outwater property. The evidence will not justify an addition to the sum heretofore allowed. It is argued that the amount is excessive. Taking into account the effect of the nuisance—less here, however, than on the lake—it does not seem to be so, as applied to the property remaining unsold.

The table of values will then be as follows:

| | |
|---|---|
| Nash | $1,200 |
| Mercelis | 350 |
| Terhune | 900 |
| Cadmus | 560 |
| R. Van Riper | 550 |
| H. Doremus | 550 |
| Alea | 450 |
| G. Van Riper | 1,150 |
| Edo Van Riper | 700 |
| Mary Van Saun | 425 |
| P. Doremus | 550 |
| Gelderman | 650 |
| Outwater | 450 |

To which must be added the sums allowed to Mr. Nash and Mr. Marcelis for arrested development.

I now come to the consideration of a subject that is not without difficulty. The court of errors and appeals, in the *Simmons Case, 60 N. J. Eq. (15 Dick.) 385*, uses, in reference to these property owners, the following language: "The relators are here asking equity (*i. e.*, an injunction), and they must do equity. A substituted remedy by giving them *adequate* compensation for their injury would be a just disposition of the controversy." According to this decision, on which all the subsequent proceedings have turned, the compensation must be full. In the paragraph of the city's amended answer, heretofore quoted, it is said, not that Paterson will *cease emptying* its sewage into the river at the date mentioned, but that "such injury or taking ('through or by means of its sewerage system'), is to be temporary and is to continue no longer than five (now four) years from the date of the filing hereof." The city, therefore, in substance, avers that the *injury* will cease at that time. The decree was that if, notwithstanding the exercise of diligence, the city was "unable to *cease polluting* the river by the time aforesaid" (March 26th, 1911), leave was reserved to apply to the court upon such terms as it deemed equitable to postpone the issuing of the injunction.

To cease emptying sewage into the stream and to cease polluting it are two different things. The evidence makes it probable that the injury will continue after Paterson ceases to empty its sewage into the river. When it first began to do this, in the decade beginning with 1870, Jersey City and Newark obtained their drinking water from the lower Passaic at Belleville. In the beginning so little did the sewage affect its purity that Passaic took its drinking water from a point not far below Paterson until 1882, and Jersey City took its, lower down, until 1898. Now, more than one hundred million gallons of water are taken daily from the river and its tributaries above Paterson, and the amount is constantly increasing. The result is that the volume of the flow of the stream past Paterson is much less than it formerly was. There is more sewage and less water to carry it off. Then we have the fact that Dundee lake is formed by damming the river just above Passaic. With these conditions, it is no wonder that the diminished flow of water, retarded by the

dam, is insufficient to carry off the polluted matter which, in large quantities, is being deposited, not only on the shores of the river and lake, but throughout its bed. It is these deposits which are now largely responsible for the nuisance. Even if the sewers cease to discharge their contents into the stream at the time named, these deposits will remain; but how long no one can undertake even to guess. As I have shown in my former opinion (*73 N. J. Eq.* (*3 Buch.*) on page *478*), the flow of water through Paterson varies enormously, not only at different seasons of the year, but in different years. If a freshet should occur, such as inundated Paterson several years ago, a great deal of this accumulated matter would, I suppose, be swept out in a few days. On the other hand, if there should be several years of comparatively even flow, the nuisance might last for a long time. I do not feel qualified to express an opinion as to how far it would be possible to abate the nuisance by opening the gates of the Dundee canal, or resorting to other artificial methods. This much is certain, that the property owners would not get "the adequate compensation for their injury" to which, in the *Simmons Case,* they were declared to be entitled, if, after the four years' period, the polluted matter thus accumulating should continue to create a nuisance.

Where the right depends upon the happening, *in future,* of some contingent event, it is a common practice for this court not to pass upon it until the contingency occurs. This principle would here seem applicable. First, because Paterson says it will *not* pollute after the date named, and it must here be assumed that it will make its averment good. Second, because of the impossibility of estimating the injury, even approximately, at this time. If it be competent for the court to assess damages at all, it is competent for it to determine *when* it will assess them, and if there be an obvious propriety in deferring the assessment, in part, until at least some idea can be formed as to what it is likely to be, I see no legal difficulty in the way. The city, by its submission, has given this court power to make an award, and therefore a complete award.

This course will avoid a real difficulty and be just to both sides. As a matter of law, I have been obliged to assume the ex-

istence of a condition which, as a matter of fact, may not be present in March, 1915, and which the witnesses say they cannot assume because of its extreme improbability. I think, therefore, that leave should be reserved to apply to this court for further compensation when the city shall cease to empty its sewage into the stream, if the pollution shall then continue; but without prejudice to the raising by the city of such legal or other objections to any further award as it may see fit. This will safeguard the right of the city, if it desires to contend that no further award should or can be made.