160 N.J. Super. 513 (1978)
390 A.2d 661
STATE OF NEW JERSEY, BY THE COMMISSIONER OF TRANSPORTATION, PLAINTIFF,
v.
SUN OIL COMPANY, A CORPORATION OF NEW JERSEY, ET AL., DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided June 8, 1978.
*515 Mr. Philip F. Mattia, Deputy Attorney General, attorney for plaintiff (Mr. William F. Hyland, Attorney General of New Jersey).
*516 Mr. Robert S. Tobin, attorney for defendant Sun Oil Company.
DWYER, J.S.C.
The State of New Jersey by the Commissioner of Transportation (State), appealed from the award of the Condemnation Commissioners in the amount of $52,700 for the taking of a portion of a gasoline service station owned by Sun Oil Company (Sun) together with a construction easement, on the ground that the award was excessive. Sun cross-appealed on the ground that the State's acquisition required awarding direct damages for property taken, severance damages for destroying the use of the remainder as a gasoline station because the remainder no longer complied with the municipal zoning ordinance for gasoline stations, with the further result that consequential damages had to be allowed for machinery and equipment; hence the award was not sufficient. The matter was heard by the court without a jury.
Four basic questions are presented:
1. On an appeal from an award of the commissioners in condemnation, under R. 4:9-2 may the State amend the complaint in accordance with the evidence?
2. In connection with a highway construction program, may the State replace existing sewer and water pipe laterals beyond the public easement, relocate electric lines beyond the public easement, and replace an underground gasoline storage tank where the cost for such work is less than the diminution in market value of the remainder of the parcel rather than pay damages in cash?
3. Will the remainder not comply with the municipal zoning ordinance for continued use as a gasoline station so that the State is required to compensate Sun as if there were a total taking of the gasoline service station, with credit for the remainder value of the land and structure?
4. What is the amount of compensation?
The basic facts are not disputed. The date of valuation is December 3, 1971. On that date Sun owned in fee simple a gasoline service station at the corner of Lyons Avenue and Schley Street in the City of Newark. Pursuant to an *517 arrangement with Sun, an independent operator ran the station and bought gasoline from Sun.
Lyons Avenue intersected Schley Street at the grade. The station was located at the northwest corner with a frontage of 88.05 feet on Lyons Avenue and 114.78 feet along Schley Street. It contained 9,456 square feet, with ingress and egress on both streets. The other property lines were interior lines.
The station consisted of a one-story cinder block building with a metalized front containing two bays facing Lyons Avenue, an office and display area facing Lyons Avenue, two lavatories at the rear end of the side of the building facing Schley Street, and a furnace room. The station building is about three feet from the eastern property line. Behind, and outside of, the middle of the rear, or northern, wall of the station's building is an underground 500-gallon waste oil, or slop oil, tank and a 1,000-gallon fuel oil tank for the furnace.
The only pump island is on the southern, or Lyons Avenue, side of the station. It is supplied by two 3,000-gallon gasoline storage tanks and one 4,000-gallon gasoline storage tank. Another underground tank near Lyons Avenue was not in service.
The sewer line from the lavatories for the station connected with a sanitary line under Schley Street. The electric lines were carried over the portion of the subject premises closest to Schley Street. The water line for the station connected to a line on Schley Street.
The highway project was the construction of Interstate 78 (I-78) which, under applicable federal law, requires that no access be given across the right of way.
The project called for the abandonment of Schley Street and the construction of a roadbed of I-78 at the bottom of a cut to be dug along the former roadway of Schley Street. The project also called for the construction of a bridge across I-78 to carry Lyons Avenue over I-78, with a ramp from *518 Lyons Avenue down to I-78 running around the southwest corner of the subject premises.
The complaint, as filed on December 7, 1971, sought to take 3,450 square feet as shown on an attached map, together with the owner's right of direct access to and from I-78, subject to all existing recorded and unrecorded public utility easements.
The map attached to the complaint showed that a Sunoco sign, the unused underground tank near Lyons Avenue and a portion of the 4,000-gallon underground tank in use near Lyons Avenue would be taken.
The first amendment to the complaint was filed April 19, 1973 and sought to take in addition to the property described in the complaint:
ALSO the right to construct and maintain a diversionary road, utility facilities and appurtenances at the location shown on the aforesaid maps, for use during the construction of the bridges and highway. Said right to terminate when the new bridges and highway are completed and open to traffic, at which time the land will be graded and seeded; all other items, including trees, shrubs, etc. will be restored * * *.
The area of the easement was outlined on an attached map. It included all the frontage on Lyons Avenue to a depth depicted by an irregular line starting at the southeast corner of the property line, extending around the interior side of the pump island and terminating at the proposed right-of-way line along the Schley Street side of the station. It embraced 1,533 square feet. Significantly, Exhibit G, which set forth the text of the easement, at the end contained the following: "The above described premises are color coded on Exhibit `H' in the following manner: Red  Parcel Area; Brown  Temporary Slope and Diversionary Road". (Emphasis supplied).
The second amendment to the complaint involved matters not germane to the issues. The third amendment reduced the permanent taking to 2,870 square feet and depicted some *519 outside lights to be taken, as well as the area for the temporary slope rights and diversionary road covered in the easement. This was filed on May 10, 1974. Sun did not object to the foregoing amendments. The commissioners filed their report on November 20, 1975, and had all the foregoing amendments before them.
After the taking, the site will have a frontage of 78 feet on Lyons Avenue, a frontage along the westerly side facing, but without access to, the right-of-way for I-78 of 119± feet, and 37± feet along the northerly boundary. The western line just misses the end of the station building and effectively precludes legal means of access to the rear of the station building on that side. Access to the rear will be available by means of the three-foot area between the station building and the eastern boundary line unless a door is cut into the rear of the station building. The remainder is irregular in shape, aggregating 6,580 square feet.
Sun contends that under the zoning ordinances of Newark the premises will no longer be usable for a service station because it will lack the requisite square footage for an interior lot and will violate certain set-back requirements. The State contends that the station will still be a corner lot and will meet the zoning requirements.
Sun's position is that the State's taking is so extensive that the subject premises' highest and best use will no longer be that of a gasoline service station. In addition, Sun contends that in respect to matters pertaining to activities of the State's contractor during construction, which the parties learned about during trial, the State should be treated as if it condemned the whole because of its taking of water and sewer line laterals.
The court will resolve issues 1 and 2 which arose out of surprise testimony at trial. The court then will resolve the other issues in the order stated.

*520 I
At the hearing an enlargement of the map attached to the complaint depicting the right-of-way acquisition and the easement across the front was introduced without difficulty or objection. The State had to call its resident engineer for the project to get the construction plans and specifications into evidence.
During the initial phase of his testimony two problems developed. The first problem related to the duration of the diversionary road easement. Sun objected to any testimony as to a date of completion for the bridge to carry Lyons Avenue over I-78. Counsel for Sun contended then, and now, that the description of the easement is so vague that it amounts to a permanent taking of that area. In part, Sun predicates its contention on the fact that the ability to use the remainder as a service station is destroyed because this easement must be considered permanent for purposes of valuation. The second problem related to the activities of the State's contractor during construction. The engineer testified that the contractor had entered the station and severed the sanitary and water lines to Schley Street on permission from the operator. All parties claimed surprise. This generated another problem, because the resident engineer also testified that the new sanitary line was located in the right-of-way for I-78 where Sun could not be given access to service it.
With consent of all parties, an adjournment was granted to permit the parties to explore the problem of what existed in the field. At the end of the adjournment it was established that Sun never consented to the entry for the severance of the lines or relocation thereof. The State had obtained permission from the operator of the station. It was established that the water line was located within the boundary lines of the subject premises in a trouble-free area and was connected to the water line in Lyons Avenue.
*521 It was further established that the sanitary line was located in the I-78 right-of-way and connected to a line on Lyons Avenue. If this is moved, the new line will have to run between the present underground gasoline tanks and the one pump island to a connection in Lyons Avenue.
In oversimplified terms, the State then moved on the record to formally limit the period of the easement to August 1976, to delete the references to seeding and grading and to substitute restoration of black top paving, sidewalks, curbs and curb cuts, and installation of substitute utilities as specified in its construction specifications as well as relocation of one underground tank. The testimony of the resident engineer was that the State does not know in advance of being on site for construction in highly developed areas where all underground utilities are. It provides in its contract specifications for the construction of highways that the contractor relocate connecting laterals that are disrupted on written orders signed by state engineers. It also requires utility companies to relocate utility services.
Except for deletion of the grading and seeding language which is appropriate for open spaces, Sun objected to all amendments on the ground that the State was lessening the taking as set forth in the easement in the third amended complaint and was attempting to lessen its obligation to pay for the damage to the remainder of the property in respect to the water and sewer lines and the underground tank by partially shifting to a cost-to-cure approach or, more accurately, a replacement in kind to cure approach.
Although the problem in respect to the sewer and water lines and the underground storage tank which was found to be in the right-of-way conceptually might be ignored in this matter and treated either as an action for trespass against the contractor and State in a separate action or an inverse condemnation, this court concluded that considering the surprise element to all parties, the opportunity to fully explore the problem by all parties, and the opportunity to present evidence concerning costs in this matter, it was better *522 to deal with the question in this action for reasons hereinafter stated.
At trial the court received a statement of the proposed amendment and the proof to be offered thereunder, and requested the parties to brief the issues after trial.
Sun does object to any further amendment because N.J.S.A. 20:3-30 requires in relevant part:
Just compensation shall be determined as of the date of the earliest of the following events: * * * (b) the date of the commencement of the action * * *.
It further urges that under Ridgewood v. Sreel Investment Corp., 28 N.J. 121 (1958), the State must pay for the rights that it stated in its relevant pleadings it was taking and could enjoy in the subject property. Sun urges that the State may not at trial, and a fortiori not on an appeal, show that its actual taking was less than what it claimed in the pleadings. It cites 6 Nichols, The Law of Eminent Domain, § 26.21, n. 55 (3 ed. rev. 1976), which states:
Where it is sought to amend the petition by adding to or detracting from the property originally described in the petition it has been consistently held that such application must be denied.
Sun contends that the complaint as amended by the first three amendments sets no terminal date for the easement but refers to the period as that "for the construction of the bridges and highway"; hence the period is speculative and must be construed as a permanent taking for there is no date at which the State must vacate. It referred the court to Wolfe v. State of New York, 22 N.Y.2d 292, 292 N.Y.S.2d 635, 239 N.E.2d 517 (Ct. App. 1968); Spinner v. State of New York, 4 A.D.2d 987, 167 N.Y.S.2d 731 (App. Div. 1957).
The State urges that the proposed amendment was at most a clarification of what was intended to be, and is, a temporary easement. It further contends that it was proper *523 to submit the plans for construction of the project on appeal, Packard v. Bergen Neck Ry., 54 N.J.L. 553, 563 (E. & A. 1892), aff'g 54 N.J.L. 229 (Sup. Ct. 1892), subject to the right of the trier of fact to assess damages on the basis of the most injurious use consistent with those plans. In Packard the Court of Errors and Appeals stated:
When a plan for the use of the condemned land is announced upon the trial of an appeal, the trial judge may properly require it to be entered upon the record by amendment of the issue or otherwise. [Id.]
Finally, the State urges that the Sreel case has no applicability to this case.
The Appellate Division has held that an amendment to a complaint in condemnation may be made in the sound discretion of the trial court. In State v. Applegate, 107 N.J. Super. 159 (1969), the Appellate Division reversed the denial of a motion to amend the complaint on appeal, but before trial on the appeal, to show that access to a street from a gas station would be permitted under the construction plans although not clearly stated in the complaint. In State v. Bakers Basin Realty Co., 138 N.J. Super. 33 (App. Div. 1975), aff'd 74 N.J. 103 (1977), it is stated:
The State may be permitted some latitude in amending a condemnation complaint. [Citation omitted]. The amendment here merely increased the amount of frontage along which access was permitted, from 25 feet to approximately 72 feet. This modest change corrected an error on the State's map and permitted access to both an existing telephone facility and an existing dirt road used to service adjoining landowners. Certainly, this amendment is not sufficient to support a change in the date of valuation. [at 43-44]
The language of the easement for the diversionary road explicitly states that it is for the period of construction and sets forth the objective event by which its termination can be judged. As noted above, the construction easement was also referred to as a "temporary easement." Any ambiguity *524 that exists arises from the reference to "bridges" and "highway open to traffic." Sun suggested that refers to the bridges on that section of I-78 which included a number of bridges and several miles of highway. Sun also pointed out that the resident engineer admitted strikes had delayed progress beyond the construction timetable originally set.
The construction plans and the testimony establish that when the bridge carrying Lyons Avenue over I-78 is complete, there is no need for a diversionary road and the contractor must restore the sidewalk, curb and curb cuts. When the complaint is construed with the preexisting construction plans, only the bridge carrying Lyons Avenue over I-78 is relevant. The court concludes that the amendment in this respect is a clarification, not an addition or deletion of property to be taken.
Neither Spinner nor Wolfe, supra, is similar to the facts in this case. In Spinner the easement stated it was permanent; hence the State had the power in the future to cut off all access to the property. In Wolfe the condemnee owned 156 acres, with 51 feet of access to one street and 4100 feet of frontage on another street. Immediately behind the 4100 frontage on the subject property was a ravine 80 feet deep and 200 feet wide. In 1962 the condemnor took the first right of access in fee and a permanent easement across the second right of access for drainage subject to the right of the condemnee to use the area for uses which do not, "in the opinion of the Superintendent of Public Works * * * interfere with or prevent the [State's] user in exercise of the rights hereinbefore described." (Emphasis in original). In 1965 the Appellate Division of the New York Supreme Court, in reviewing an award for total loss of access, stated that the condemnor should be allowed to stipulate that the owner would have the right to build a bridge over the ravine. It remanded the matter to the trial court.
The trial court followed the direction, the condemnor stipulated for the bridge, and the award was reduced. The Court of Appeals reversed on the ground the amendment *525 should not have been allowed. The condemnor must pay for what it declares it is taking. It distinguished the case before it from others where there was an ambiguity in the language of the declaration of the taking, in the following passage:
The State's reliance upon Jafco Realty Corp. v. State of New York (18 A.D.2d 74, [238 N.Y.S.2d 66] affd. 14 N.Y.2d 556 [248 N.Y.S.2d 651, 198 N.E.2d 39]) and Clark v. State of New York (20 A.D.2d 182, [245 N.Y.S.2d 787] affd. 15 N.Y.2d 990 [260 N.Y.S.2d 10, 207 N.E.2d 606]) is misplaced. Both involved easements which on their face, as well as by necessary implication, reserved access to the claimants.
In the Jafco case, there was reserved to the claimant a preexisting easement for a right of way to be exercised in a manner that did not "interfere in any way with the Public use" but the pre-existing right of way was permanently assured by the condemnor's construction of its highway on an overpass bridging the claimant's passageway. And, in Clark, awards were made to the claimants for 90% of the value of a strip of land over which the condemnor appropriated an easement for an electric transmission line and there was reserved to the claimants the fee ownership and any use which did not interfere with the condemnor's easement. There was  as noted by the Appellate Division (20 A.D.2d, at pp. 189-190 [245 N.Y.S.2d 787])  disagreement between the parties as to the construction and meaning of the written instrument which created the easement. The question in the case was whether the ambiguity might be resolved by findings made by the Appellate Division, and it was so resolved. In both cases, we reached our decision that a permanent right of access and use had been reserved to the claimants under the terms of the original taking and not on the basis of a modification of the appropriation by subsequent concessions or stipulations.
The present case is quite different. No one could reasonably expect that the claimant would build a bridge across the easement taken by the State when the appropriation map made it clear that any right possibly reserved to him was terminable at the will of the State. Without some further grant from the State, the claimant had no reasonable means of gaining access to his remaining land. Indeed, as we have already demonstrated, the Appellate Division was fully aware that the easement taken had cut off the claimant's access and that any right he had to any access was dependent upon what the State might consent to. It was only because the claimant's existing means of access had been destroyed that the court below found it necessary to suggest that the State might be "amenable" to restoring to the claimant, through a stipulation or other agreement, *526 the access which he had lost. Such a procedure or device clearly offends against our settled rule prohibiting the State from attempting to reduce its damages by a subsequent limitation on its original appropriation. [Id., 22 N.Y.2d at 294-295, 292 N.Y.S.2d at 639-640, 239 N.E.2d at 520]
The easement for the diversionary road for the period of construction was not an exclusive easement. Sun and its tenant had the right to use the area for purposes of gaining access to the station as did the customers. The commissioners had this information by reason of the third amendment. In their report they stated that they examined the premises.
In Doremus v. Paterson Mayor and Aldermen, 73 N.J. Eq. 474 (Ch. 1907), the Court of Errors and Appeals had remanded the matter, directing that the city should be allowed to tender compensation to landowners for damages resulting from the city's pollution of the Passaic River instead of being enjoined from polluting the river. Chancery allowed the city to tender a defense that damages should be fixed for the period to the date of hearing and for five years thereafter, because the damages, if any, were temporary due to efforts to build a new sewer and fixed damages on the basis of loss of rental value for that period.
In a later decision between the same parties, Doremus v. Paterson, 81 N.J. Eq. 27 (Ch. 1913), aff'd 82 N.J. Eq. 640 (E. & A. 1914), the court allowed complainants damages for four more years because of difficulties in getting necessary legislation, plans and financing organized for the Passaic Valley Trunk Sewer. At the end of the decision the court stated that there should be a reservation in the decree for future application for damages if the new sewer was not operational by 1915 and the pollution continued:
If it be competent for the court to assess damages at all, it is competent for it to determine when it will assess them, and if there be an obvious propriety in deferring the assessment, in part, until at least some idea can be formed as to what it is likely to be, I see no legal difficulty in the way. The city, by its submission, has given this court power to make an award, and therefore a complete award. [81 N.J. Eq. at 37; emphasis in original]
*527 Although the Doremus case did not involve the power of eminent domain but the problem of a municipality placing solid pollutants in waters adjacent to plaintiffs' properties such that they were deprived of ice, fish, water and recreation, the flexible remedy of allowing separate awards for successive periods of taking, where taking is on a temporary basis for an indefinite or unascertainable period, has been applied under the power of eminent domain. See Kimball Laundry Co. v. United States, 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949) (rental of commercial laundry taken by Army for duration of war fixed an annual rental basis).
Where a temporary construction easement is taken for highway purposes and the property is rented, the rental value of the property taken is the normal measure of damages and is awarded for the period taken. Commonwealth v. Fister, 373 S.W.2d 720 (Ky. 1963).
Rental value of the land involved, not a business loss, is the proper measure of damages for a temporary easement of this nature. [Citations omitted]
There is a special reason why evidence [of business losses] of this character is inadmissible as proof of damages for the taking a temporary construction easement. The business loss is actually attributable to the disruption of the highway during the period of reconstruction rather than to the occupancy of the temporary easement area. Highway construction is carried out in the exercise of the police power, and inconvenience or injury to adjoining property owners, arising from reasonably necessary operations on the right of way, is not compensable as a "taking" of their property in the constitutional sense. [at 723]
Neither the Supreme Court's decision in the Sreel case, supra, nor in South Orange v. Alden Corp., 71 N.J. 362 (1976), are inconsistent with allowing compensation for a temporary easement on a periodic basis, or even reserving a right to the condemnee for further relief for subsequent periods. In each of the cases last referred to, the condemnor took on a permanent basis and hence all damages even for *528 future changes in the proposed use by the condemnor had to be allowed in the one action. In the case at bar, the State labeled the taking as temporary.
In this case the court will give compensation for the period of the taking to date of conclusion of the hearing. Any compensation for a subsequent period will be compensation for a different period and hence in a sense a different taking. All relief, however, will be granted in this action and appropriate provision made in the final judgment. Even without an amendment to a definite date, an independent fact would establish the end of the life of the easement  completion of the bridge.
In Alden, supra, the Supreme Court stated that the trier of fact would have to evaluate the duration of use in assessing damage. This appears to be the same approach followed in Packard v. Bergen Neck Ry., supra.
The court concludes that Sun is incorrect in its assertion that, on the facts in this case, the State's failure to specify a particular date by which its easement for construction would expire, the area of that easement must be regarded as a permanent taking.
The fact that State did specify a date for completion makes the task of fixing damages in this action easier but does not change the essential nature of the easement or that its value should be fixed on a periodic basis.
The court finds that the allowance of the amendment to the complaint in respect to the construction easement does not prejudice Sun and does not diminish what the State undertook to take before the hearing before the Commissioners. The third amendment itself stated that it was temporary.
In relevant part R. 4:9-2 provides:
If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings and pretrial order, the court may allow the pleadings and pretrial order to be amended and shall do so freely when the presentation of the merits of the action will *529 be thereby subserved and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.
The court did grant Sun a continuance of a week to explore the field problems and gather necessary data and costs in respect to the sewer, water, electric lines and underground tank. No objection has been made as to the time of continuance.
The court also granted each side the right to brief the legal issue which is dealt with under point two of this decision.
The portion of the amendment covering the diversionary road is really a clarification of existing language. The portion of the amendment for the sewer and water pipe covers a problem not known until trial. Cf. Department of Pub. Works & Bldgs. v. Greenlee, 63 Ill. App.2d 425, 211 N.E.2d 771 (App. Ct. 1965) (after filing of complaint for taking five foot strip of land across front of property and all access to road, except for use incident to a residence, for which loss of access owner filed counterclaim, judgment for damages for loss of commercial access reversed on ground trial court erred in not granting state's motion to amend pleadings to delete taking of commercial access under changed construction plans).
The underlying philosophy and structure of the present judicial system is to try to decide all issues related to one controversy or matter between the same parties in one action. Wm. Blanchard Co. v. Beach Concrete Co., 150 N.J. Super. 277 (App. Div.), certif. den., 75 N.J. 528 (1977).
The court has concluded that State's fourth amendment to the complaint should be allowed and the legal issue as to cost to cure resolved herein subject to qualification in Point II, infra.
*530 The fourth amendment in relevant part reads:
TEMPORARY DIVERSIONARY ROAD
Proposed Amendment:
And also, the right to construct and maintain, for a period of two years, from August 1, 1974 to August 1, 1976, a diversionary road, utility facilities and appurtenances at the location shown on the aforesaid maps, for use during the construction of the bridges and highway. In the event that the said right shall continue for more than two years, the owner is to be compenstated for such right at a rate to be determined by these proceedings. Upon the termination of said right, the land will be restored to the condition existing before the construction of said diversionary road, including the reconstruction of paving, sidewalks, curbs and driveway openings.
Thrust of Amendment:
1. Time period on easement clarified
2. Restoration clarified
WATER & SEWER PIPE
Proposed amendment:
And also, the right to enter upon the owner's remaining land with men, equipment and material for the purpose of relocating the sanitary sewer and water line at the locations shown on the aforesaid maps.

II
As noted above, the State's project engineer testified that it is physically impossible for State to know in advance of construction in the field the location of each lateral connection to sewer and water pipes for each affected property. The State provides drawings for existing sewer and water lines and other utility lines in the streets and where new lines are to be located. In respect to lateral hookups, the specifications provide the contractor is to make them.
In the usual case all work is done in the public easement where the hookups are located. There is no need for the contractor to go beyond the public easement. The present case differed because of the abandonment of Schley Street. No explanation was offered as to why the State's engineers could not anticipate cutting off laterals when all the lines in Schley Street were to be abandoned. In order to keep *531 sewer and water lines functioning, new laterals had to be installed from the structures beyond the public easement to the mains in the public easement in Lyons Avenue.
The State's engineer testified that he secured the permission of the person at the station to relocate the lines. He issued a change order to the contractor. The contractor on two separate days went in, cut off the old lines, ripped up the pavement, installed the new lines to Lyons Avenue and restored the pavement within the station property lines.
For reasons stated above, the sewer line has to be relocated and an underground gasoline storage tank has to be relocated. In addition, the electric lines have to be brought in from a new pole connection on Lyons Avenue.
The State contends that since it has the right to require its contractor to do this work as part of the cost of doing the project, it will do the work beyond the public easement by its contractor, and it will order Public Service Electric and Gas to do the necessary relocation under an outstanding order for utility relocation, Sun is entitled to no damages. The State offered no evidence as to the cost of doing the utility work but did provide testimony as to the cost of relocating the 4,000-gallon underground tank, a portion of which would be in the I-78 right of way.
Although the State has found no decision in New Jersey to support its position, it urges that the out-of-state authorities found in 4A Nichols, supra at § 14.22, support its position.
Sun contends that State is urging a cost to cure approach and that State v. Cooper Alloy Corp., 136 N.J. Super. 560, 570 (App. Div. 1975), prohibits such an approach in respect to private property even though such an approach may be proper, if not required, for property previously dedicated to public use.
Neither the State nor Sun has correctly analyzed the problem, although the authorities cited by each suggest the solution which the court concludes is the correct one.
*532 In the Cooper Alloy case, supra, the Appellate Division said that in cases such as the present one, involving a partial taking:
[T]he compensation to be paid a condemnee should be the difference between the market value of the entire property immediately before and unaffected by the taking, and the market value of the remainder immediately after and as affected by the taking. Alternatively, it may be the value of the property taken based upon its highest and best use, plus compensation for any diminution in value resulting to the remainder from the taking. [at 567-68; citations omitted.]
The State has referred to the decision in Pima Cty. v. De Concini, 79 Ariz. 154, 285 P.2d 609 (Sup. Ct. 1955); Kennedy v. Commonwealth, 336 Mass. 181, 143 N.E.2d 203 (Sup. Jud. Ct. 1957); State Highway Comm'n v. Pinney, 84 S.D. 311, 171 N.W.2d 68 (Sup. Ct. 1969); Mayes Co. v. State, 18 N.Y.2d 549, 277 N.Y.S.2d 393, 223 N.E.2d 881 (Ct. App. 1966); and 4A Nichols, supra at § 14.22, as supporting its position that it has a right to do the work in respect to the sewers, electric lines and tank  i.e., replace in kind.
The decisions just cited do not hold that the condemnor has the right to do, or that the person whose property is being taken has a duty to do, corrective work. Judge Bigelmeier in the Pinney case, supra, analyzes the statements in cases and texts to the effect that the property owner is under a duty to minimize damage in cases of partial taking by constructing or installing facilities to replace those taken. He points out that the owner is only entitled to damages and that owner may be regarded as under a duty to mitigate damages where it is reasonable to do so; hence the amount of the owner's compensation is limited by that standard whether or not in fact the owner does the work.
The evidence of the cost of taking action to minimize damage is relevant in determining the value to the remaining parcel. In 4A Nichols, supra at § 14.22, it is said:
*533 When the damage to the owner's remaining property can be avoided by grading or repairs, and the reasonable cost of such work is less than the decrease in the market value of the real estate, such cost forms the measure of damages. Unless the injury to the remaining land is so severe as to render it useless for any purpose, the condemnor is not bound to pay the full value of the entire tract, even if the owner has abandoned all use of the property. The prospect of restoring the property to its original condition must, however, be reasonably certain. * * * Although damages cannot be enhanced by the owner's inactivity, in the absence of proof that an effort to avoid the damage was practicable, a failure to make the attempt would not diminish the damages actually suffered. [Footnotes omitted]
The applicable principle is stated and illustrated in the following quotation from Pima County v. De Concini, supra:
The rule also is that in arriving at the market value of land which has been damaged by the exercise of the right of eminent domain the court has a right to admit evidence of possible expenditures which, if expended, would diminish the damages. While the measure of severance damages is the difference between the market value before and after the taking, evidence of expenditures which, if made, would cause a change in market value are admissible and should be considered by the court in arriving at such value. The limitation of the rule is that the expenditures must be in such an amount as will not exceed the difference between the market value before and after taking which would have existed without the expenditure. * * *
A person whose property has been damaged is entitled to be restored as near as possible to his former position. According to the evidence plaintiffs had a property worth $77,915.60. Access was destroyed. A purchaser willing to pay the valuation testified to by the witnesses would discover that if he spent $21,356.60 for bridges he would then have a property worth $57,365.50. He would deduct the cost of the bridges and pay the plaintiff the difference, or $36,009.10. With this amount and the judgment for $41,906.50, the plaintiff would have the value before taking, ($77,915.60). [285 P.2d at 611]
This court concludes that the authorities referred to by the State mean that that evidence as to the cost of constructing facilities which will probably reduce, or minimize, the damage to the remaining parcel where that cost is less than the decrease in value of the remaining parcel is admissible *534 and the jury should be properly instructed as to its use. It does not mean that the State may enter the private property of the condemnee and do the work. Compare N.J.S.A. 27:7-11 which authorizes the State Highway Commissioner to pay for the cost of drilling a new well for potable water where the construction of a state highway has destroyed a pre-existing well for potable water, but does not authorize the State to do the work.
In connection with utility relocation, one must first determine what is the property of the utility and what easements does the utility have. The State has the power to order a public utility which has facilities in a public easement to relocate them and do all necessary work not to disrupt service, either at the utility's expense or at State's expense where the Legislature has so provided. See Port of N.Y. Auth. v. Hackensack Water Co., 41 N.J. 90, 104-108 (1963).
Utilities which string wires usually either have an easement or implied consent to have the wires come over the owner's land from a pole, or underground facility, to a meter or other junction. Such a utility may even impose a connection charge. It is the State's representation that the utility relocation order issued to Public Service Electric and Gas Company pursuant to N.J.S.A. 27:7A-7 and Public Utility Commissioners' approval thereof requires that utility to run the new line from the new pole connection to the old structure. Sun has not presented to the court any proof that it is required to construct the new line or that Public Service Electric and Gas Company lacks authority to enter to do this work. Cf. N.J.A.C. 14:3-8.
In the City of Newark, where the subject premises are located, water and sewer services are municipal utilities. Under applicable ordinances the owner must carry the lines from the structures to the shut-off valves, or connections, in the public easement, usually at the curb line. Such lines are the private property of the owner and are located within the bounds of privately owned property. Cf. N.J.A.C. 14:9-2.1; *535 Rev. Ordinances of Newark, § 21:2-10 (sewer); § 25:1-6 (water).
If the State is to do this work, then it must exercise its power of eminent domain absent the consent of Sun. In State v. Totowa Lumber & Supply Co., 96 N.J. Super. 115 (App. Div. 1967), the Appellate Division affirmed the State's taking a portion of an adjoining landowner's tract to build an access road to premises of which the State acquired a portion and the balance would have been landlocked without the access road. The Appellate Division found that there was a public interest in the acquisition and the State's construction of the access road at the State's expense in that there was a substantial reduction in the possible damage award and in avoiding landlocking the remainder. It was also found that the State Highway Commissioner had not abused his discretion but exercised sound judgment in producing an economically sensible result.
At the hearing it was established that there was no emergency condition because of the work of the State's contractor. Sun introduced testimony as to the costs of relaying the sewer line properly. This will require running the pipe underneath the pump island and between the connecting pipes from the underground gasoline tanks which service the pumps.
The State introduced no evidence as to the sewer costs. It did introduce evidence as to cost of moving the 4,000-gallon underground tank. This did not differ substantially from Sun's evidence on the point.
On the facts in this case, the court concludes that the State did take the sewer line and is responsible for the cost of relocating the underground storage tank. The court further concludes that Sun should be awarded these elements as cost of minimizing damages to the remainder as part of the damages in this action. Based on the credible testimony, the court awards $5,850 for the underground tank and $1,700 for the sewer.
*536 Since Sun has not complained about the water line or defective pavement work, the court concludes that Sun has waived any claim as to this. The State's motion to amend the complaint to do work is denied.

III
Sun correctly urges that municipal zoning ordinances may not be ignored in condemnation cases. State v. Birch, 115 N.J. Super. 457 (App. Div. 1971); State v. Rohrer, 145 N.J. Super. 63 (Law Div. 1976). Unlike the facts in Rohrer, where the State physically cut off the front of the building with severe damage to the heating, electrical and plumbing systems and the owner called the chief building inspector to testify that the structure was so altered that a new certificate of occupancy would have to be issued before it could be used, Sun offered only a copy of the zoning ordinance in addition to the opinion of its real estate appraiser that the remainder property could no longer be used as a gasoline station. He stated that in his opinion the station would not meet minimum lot size and the curb cuts would violate side yard requirements.
The State's appraisers testified to the contrary. Neither party called any official of the City of Newark.
The relevant provisions of zoning ordinance of the City of Newark are:
* * *
27:1-1(c) (5) Automotive service station or gasoline filling station means a building or premises used for the retail sale of gasoline or fuel or oil for the operating of motor vehicles, and repairing and servicing of motor vehicles, including a 2-bay automobile laundry and a lubritorium and the retail sale of accessories incidental thereto. Body work, fender repair and complete motor overhauling are forbidden.
* * * *
(12) Corner lot means a parcel of land not over 60 feet in width at the junction of, and fronting on, 2 intersecting streets, having an area not greater than *537 6000 square feet and a frontage on one of the intersecting streets not greater than 100 feet.
* * * *
(28) Interior lot means a lot other than a corner lot.
27:4-2 Additional use regulations
(a) (1) [Permit for gasoline station must be obtained after hearing before board of adjustment]
* * *
(3) Gasoline Filling Stations:
* * *
(i) No gasoline filling station shall be built on a corner lot having a width of less than 60 feet and an area of less than 5,000 square feet; or on an interior lot having a width of less than 100 feet and an area of less than 7,500 square feet.
* * *
(v) Driveways shall cross the sidewalk at right angles and shall not be more than 18 feet wide at any point thereof. Driveways must be at least 10 feet from any side lot line or from the intersection of street lines. There shall be no more than one driveway on any one street frontage unless the street frontage is in excess of 70 feet, in which case there may be a maximum of 2 driveways on such street frontage provided such driveways are 10 feet apart.
As noted above, the frontage on Lyons Avenue after the taking will be 78 feet. The frontage on I-78 will be 119± feet. The area will be 6,580 square feet spread over an irregularly shaped tract.
With a 78-foot frontage, it is mathematically possible to provide for two ten-foot setbacks and install two 18-foot wide driveways with a distance of ten feet between them. This would meet requirements of § 27:4-2(a)(3) of the ordinance.
However, Sun contends that under the construction plans of the State, the driveways are to be 26 and 24 feet wide; hence there will be an invasion of the side yard requirements. Further, Sun contends that State's appraisers relied upon the construction drawings and hence their testimony that the station could be continued as a gas station after taking must be disregarded.
*538 The record does not establish what has been constructed. The State offered to stipulate on the record that if the construction that takes place varies from the construction drawings or requires a variance from the zoning ordinance, it would consent to a reopening of the case for Sun to prove any damage by reason of the change from the construction drawing or zoning requirement. Cf. Carpenter v. Easton & A.R.R. Co., 24 N.J. Eq. 249 (Ch. 1873) (after parties reached settlement in condemnation on basis railroad would build a bridge over property, railroad changed design to provide for embankment that divided property and court permitted reopening).
Sun also contends that the station will not be a corner lot, because it will lack access to I-78; hence it must be treated as an interior lot which requires 7500 square feet for a gasoline station. In the absence of appropriate proceedings involving the City of Newark, the court cannot give any binding interpretation of the ordinance.
Sun has called no witness from the City of Newark. It has furnished no interpretation by the city. There is some conflict between the 60 feet referred to in § 27:1-1(c)(12) of the ordinance (corner lot not over 60 feet in width) and § 27:4-2(a) (3) (i) (no gasoline filling station to be built on corner lot with width less than 60 feet). In dealing with gasoline stations, the city evidently treats the requirements for corner lots in a different manner than for regular corner lots.
There is no literal requirement that there be access to each street on which the property has frontage.
There is no dispute that the station has operated for many years. It was operating at the time the court, with all parties and counsel, visited it during the period of the adjournment.
If as a result of the State's action there is a deviation from the square footage requirements and the setback requirements for a curb cut, Sun is not helpless. It may apply for a variance for the continued use of the station as a gasoline *539 station. There is a strong probability that either the municipal authorities will grant it or on appeal a court will order it. Cf. Esso Stand. Oil Co. v. Newark Bd. of Adj., 16 N.J. Super. 409 (Law Div. 1951). Based on the authorities cited under point II, the court concludes that Sun would be under a duty to apply for such a variance in order to minimize damages or forego recovery for the loss of such value.
The court concludes that Sun has failed to prove by a preponderance of the evidence that the municipal zoning ordinance will preclude the continued use of the subject premises as a gasoline station or that it is probable that a variance from area coverage and set back requirements would not be granted for such use.[1]

IV
The State presented testimony of two appraisers who gave their opinions as to the fair market value of the station before taking and unaffected by the taking, and the fair market value of the remainder immediately after and as affected by the taking. Each utilized the three basic methods of valuation: (1) cost of reproduction less depreciation, (2) comparable sales and (3) capitalization of income.
At the trial there was testimony as to the value of the diversionary easement and the right to enter and lay a new sewer line. The State offered no specific testimony as to such items as the Sunoco signs that were to be taken, except for the cost of replacing the underground tank.
Sun presented testimony of one appraiser who based his opinion as to the value before taking solely on capitalizing income. He testified that he was not familiar with what the arrangement was between Sun and the operator, Martinez. He was furnished the gallonage and other data from Sun's attorney or company personnel. Sun's appraiser *540 utilized what he described as a fair market arrangement to get his before value. Since he concluded that the station will not be usable as a gasoline station after the taking, he used the cost approach to get a land value and the opinion of another witness for the structure value.
He testified that today when an oil company leases a gasoline station it enters into a lease with an owner under which it pays two cents a gallon to owner and pays all other expenses including real estate taxes. He stated an owner nevertheless must allow for certain expenses detailed below.
One exhibit establishes the gallonage sold as follows:

 1964 447,532 1968 343,945
 1965 438,948 1969 226,104
 1966 467,384 1970 350,232
 1967 395,059 1971 511,422
 1972 635,868

He further testified that he essentially disregarded the gallonage prior to 1971 because the record shows that operators prior to Martinez, who took over in 1971, were inefficient. He noted that the monthly gallonage on a stabilized basis was:

 (a) 1970 29,166
 (b) 1971 42,619
 (c) 1972 52,989

He concluded that 45,000 gallons a month was a fair stabilized gallonage.
By using two cents a gallon, which he said was based on his experience and adjustment from two Sun leases in evidence, he calculated the gross annual income and deducted the owner's expenses.

*541
 Gross annual income $10,800
 Deduct
 Vacancy $324
 Reserve for repairs 314
 Management 314
 Insurance 300 1,252
 _____ _______
 Net income $ 9,548
 =======

He then capitalized this at a rate of 12.5% for a value of $76,400. He valued the land after taking at $9,900 and the structure at $3,600, for a total of $13,500, hence the damages at $62,900. Since in his opinion the station would not be usable as a gasoline station, he stated $17,286 of site improvements and machinery should be added for a total of $80,186 damages.
Since the court has concluded that Sun has failed to show that the station will no longer be usable, the court disallows the $17,286.
Although the Appellate Division has said that gallonage is a factor to be considered in a proper setting, State v. Hudson Circle Service Center, Inc., 46 N.J. Super. 125 (1957), it has warned that gallonage must be used with great caution. See Humble Oil and Refining Co. v. Englewood Cliffs, 135 N.J. Super. 26 (App. Div. 1975), aff'd 71 N.J. 401 (1976), wherein it is said:
First of all, it must be recognized that gallonage figures, depending as they do on the brand of gasoline sold, the skill and efficiency of the dealer, the advertising efforts made, etc., are more reflective of the business conducted on the property than on the market value of the real estate for assessment purposes. Indeed, it has been said that the volume of gasoline sold depends upon five major factors: price, management, brand, location and suitable improvements, only two of which are related to the value of the real estate. Brick, "Gasoline Service Station Appraising," in Friedman Encyclopedia of Real Estate Appraising (rev. ed. 1968), 849, 863-864. The gallonage approach, applied exclusively, is contrary to the philosophy expressed in Aetna Life Ins. Co. v. Newark, [10 N.J. 99, 109 (1952)]. [at 30]
*542 The view that gallonage should not be the sole basis for valuation has been applied in condemnation cases as well as tax cases. See In re County of Nassau (Old Country Rd.), 57 Misc.2d 488, 292 N.Y.S.2d 954 (Sup. Ct. 1968) (court rejected owner's attempt to use arrangement other than one in effect to develop value based on gallonage); cf. McCall Serv. Stations v. City of Overland Park, 215 Kan. 390, 524 P.2d 1165 (Sup. Ct. 1974); Phillips Petroleum Co. v. City of Omaha, 171 Neb. 457, 106 N.W.2d 727 (1960).
The testimony of Sun's appraiser shows that he utilized the efficiency of different operators in selecting what gallonage to use. The effect on value is obvious. His 45,000 stabilized gallons is based on 1971 and 1972. The latter is the year after taking. If 1970 is included, then the stabilized gallonage is about 41,000 gallons monthly. If 1972 is excluded and 1970 and 1971 used, the stabilized gallonage is about 35,000 gallons. The differences in values for gross income, even Sun's appraiser explains, is due in substantial part to the new operator. The difference in gallonage in four years is about 400,000 gallons annually.
Sun objected to any testimony as to the arrangement between Sun and Martinez for payments for the station on the ground that there was no lease. Since Martinez had use, if not possession, of the premises and conducted activities such as repairs, the court overruled the objection. Sun made no showing that the arrangement was temporary, induced by the prospective taking, or compelled upon it by forces other than market forces.
Under the arrangement operator pays $725 per month, which is credited against a gallonage charge of 1.7 cents per gallon. Sun pays the real estate taxes, insurance, and maintenance. Stated in other terms, the operator does not have to make a separate payment if he sells about 45,000 gallons per month, but he does if he fails to meet that minimum.
*543 There is credible testimony in this matter that this type of arrangement exists with older stations. It is similar to the arrangements described in In re County of Nassau (Old Country Rd.), supra.
In developing their values on the capitalization of income approach, each of the State's appraisers deducted the amount of the real estate taxes paid by Sun. Each conceded that the leases on what they said were comparable properties provided that the tenants were to pay the taxes. One of the State's appraisers conceded that he would not use an "arrangement" between an oil company and an operator to establish a fair market rent. He explained that such arrangements have to be analyzed to see if operator is getting a discount for the purchase of gasoline before one can determine rent.
Sun contends that for all of the foregoing reasons one should not deduct the real estate taxes paid by Sun in arriving at a value based on the income approach.
The arrangement is on a year-to-year basis. Presumably, if Sun could shift the burden of paying real estate taxes and other expenses to its operator, as the owners of the other stations in Newark and Paterson did (about which there was testimony), Sun would have done so.
The real estate taxes were $2,619.15. A person buying the property would certainly take into account the fact that owner had to pay the taxes. See 5 Nichols, supra at § 19.21 (condemnor may show rent on property where property is in its highest and best use). For these reasons, the court concludes that the real estate taxes should be deducted.
Schwartz testified for the State that he had a value of $57,000 for the station before taking based on the income approach. He used a stabilized gallonage of about 40,000 gallons a month. See the 1970 and 1971 figures, above. He then used $725 a month minimum payment for an annual gross income of $8,700. He deducted expenses of $3,220 to get a net income of $5,580. He capitalized this at 9.8% for a value of $57,000.
*544 The State's testimony as to values may be summarized as follows:

 Before
 Income $57,000
 Cost approach 58,825
 Market approach 56,000
 Value $56,000
 After
 Income $26,000
 Cost 29,625
 Market 26,000
 Value 26,000
 Less cost to cure 3,000
 _______
 Value after taking $23,000
 =======

Since the court has rejected Sun's contention that the station must be abandoned, there is no relevant evidence from Sun as to the value after taking.
Review of the testimony of the State's appraisers shows that the alleged comparable properties in most cases were devoted to activities such as body shops, other specialized work, and the incidental sale of gasoline. Many adjustments of a percentage nature were made for differences in size, etc. The testimony established that the station was a good neighborhood station. The State's appraisers stated that this type station suffered less vandalism than other stations in Newark that attracted a transient trade. The court's inspection of the station confirmed that it was a good neighborhood station.
The credible evidence also established that, after taking, the utility of the pump island will be diminished, the operation of the station because of physical limitations will be more difficult, and Sun may have to apply for a variance.
Since expenditures to cure defects should lessen the injury to the remainder, the court concludes that the State erred in subtracting $3,000 for cost to cure from the value *545 of $26,000 after taking. If the State learned of the cost to cure problems during trial, then, on its theory, the remainder cannot have a smaller value if the problems are corrected.
However, after a review of all evidence, and with respect to Sun's contentions that the State's appraisers ignored certain items to be taken and over-adjusted for some of the comparables with the result that the remainder value of $26,000 is too high, the court concludes that there is some merit to Sun's contentions and fixes the value of the remainder at $22,000 and determines that the value of the improvements taken is $4,000.
In respect to cost cure, based on all the evidence, the court will allow $500 for a new slop oil tank, $1,000 for a new fuel oil tank, $5,850 for a new 4,000-gallon underground tank, and $1,700 for a new sewer line, for a total of $9,050. This amount should be subtracted from severance damages. See Pima County v. De Concini, supra.
Damages are awarded as follows:

 Before value $56,000
 After value of remainder 22,000
 _______
 Damages $34,000
 =======

Distribution is as follows:

 Land taken $11,500
 Improvements taken 4,000
 Severance damages 9,450
 Cost to cure 9,050
 _______
 $34,000
 =======

To this should be added a value of $65 a month for the temporary easement.
NOTES
[1] To protect Sun, the court will incorporate the State's concession regarding future reopening of the case in the final judgment.